**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: | : | |
| **MILTON THOMAS, SR.,** | : | **Chapter 13** |
| | : | |
| Debtor. | : | **Bky. No.  04-10175 ELF** |
| | : | |
| | : | |
| **MILTON THOMAS, SR.,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| | : | **Adv. No. 13-0029** |
| **CITY OF PHILADELPHIA, <u>et al.</u>,** | : | |
| | : | |
| Defendants. | : | |

# O P I N I O N

## I.  INTRODUCTION

It is the hope of every chapter 13 bankruptcy debtor that the completion of his or her chapter 13 plan will solve, once and for all, the debt problems that drove the debtor into bankruptcy.  Unfortunately, it does not always work out that way.  Sometimes, the status of a pre-petition debt is not entirely clear after the conclusion of the bankruptcy case and it is necessary for the bankruptcy court to revisit the case to sort out the legal consequences of the events that took place and whether additional relief should be afforded to the debtor.  This is such a case.

Milton Thomas ("the Debtor") filed a chapter 13 case in 2004, completed his chapter 13 bankruptcy plan and received a discharge in 2009.  In 2012, he filed a civil action in the U.S.

1

District Court for the Eastern District of Pennsylvania, challenging the post-petition and post-discharge collection actions of five (5) defendants.  The district court referred the civil action to this court.  Thus, the Debtor has returned to this court to enforce what he believes are the benefits of completing his chapter 13 bankruptcy case.

Three (3) of the five (5) defendants filed motions to dismiss the Debtor's complaint: under Rule 12(b)(1) for lack of subject matter jurisdiction, and under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.[1]  After reviewing the materials submitted by the parties, I concluded that the Rule 12(b)(6) motions should be treated as motions for summary judgment under Fed. R. Civ. P. 56 and afforded the parties an opportunity to present additional material in support or opposition to the motions.  See Fed. R. Civ. P. 12(c).

The matters are now ready for decision.

For the reasons explained below, I will:

(1)  grant the summary judgment motions filed by the three (3) defendants; and

(2)  provide the Debtor with an opportunity to be heard as to why the complaint should not be dismissed with respect to the two (2) remaining defendants who did not file motions to dismiss.[2]

---

[1]    The referenced rules are the Federal Rules of Civil Procedure, applicable in this adversary proceeding by virtue of Fed. R. Bankr. P. 7012(b).

[2]    See Oatess v. Sobolevitch, 914 F.2d 428, 430 n.5 (3d Cir. 1990) (trial court may raise the issue of the deficiency of a complaint under Rule 12(b)(6) sua sponte, so long as the plaintiff is accorded an opportunity to respond; Dougherty v. Harper's Magazine Co., 537 F.2d 758, 761 (3d Cir. 1976) (same).

## II. FACTUAL AND PROCEDURAL BACKGROUND

In order to understand the issues before the court, it is necessary to set out the somewhat

lengthy and convoluted procedural and factual background.


### A. The Bankruptcy Case

On January 6, 2004, the Debtor filed a chapter 13 bankruptcy petition in this court.  In

Schedule A of his bankruptcy schedules, the Debtor listed ownership of three (3) properties in

Philadelphia, PA.  On Schedule D, the Debtor listed the City of Philadelphia ("the City") as a

secured creditor with respect to the three (3) properties for outstanding water and real estate tax

debts.  One of those properties is located at 1251 S. Ruby Street ("the Ruby Street Property").

In 1997, more than six (6) years before the bankruptcy filing, the City transferred a

portfolio of delinquent real estate tax liens to the Philadelphia Authority for Industrial

Development ("PAID"), a public instrumentality of the Commonwealth of Pennsylvania.  Some

portion of the delinquent taxes on the Ruby Street Property was included in that portfolio,

specifically, the taxes due in the period 1992-96 ("the 1992-96 Taxes").  Subsequent to the tax

lien transfer, and most likely prior to the commencement of the Debtor's bankruptcy case, PAID

transferred the portfolio to Wachovia Bank, as Trustee ("Wachovia").[3]

The Debtor did not schedule either PAID or Wachovia as a creditor and neither entity had

notice of his case.  This is understandable in that the record does not reflect that he was given

---

[3]        In Paragraph 2 of the Complaint, the Debtor alleges that the transfer from PAID to
Wachovia occurred on June 15, 2004, after the commencement of his bankruptcy case and prior to the
confirmation of his chapter 13 plan.  As explained below, his factual dispute has no effect on the
outcome.

3

notice of the transfer of the City's tax claim to either of those third parties.

The following events occurred in the course of the chapter 13 plan confirmation process.

The Debtor filed his initial chapter 13 plan on January 20, 2004. (Bky No. 04-10175, Doc. #7) He filed an amended plan on June 17, 2004, a second amended plan on September 20, 2004 and a third amended plan on November 10, 2004. (Id., Doc. #'s 38, 57, 71). Significantly, the record does not reflect that the Debtor served the City with copies of any of the four (4) plans, as required by Local Bankruptcy Rules 3015-1(b) and 3015-2(a)(1). (See id., Doc. #'s 38, 58, 71).[4]

On June 17, 2004, the Debtor filed an Amended Schedule D, (id., Doc. #37), disclosing that the City held a $10,000.00 claim secured by the Ruby Street Property for "water and real estate taxes," incurred "1/05/86."

Also on July 17, 2004, the Debtor filed Proof of Claim No. 5-1 ("Claim No. 5-1") on behalf of the City, stating that the City held a $10,000.00 claim secured by the Ruby Street Property.[5]

---

[4]    The Debtor did not file a certification of service with respect to his original chapter 13 plan, filed on January 20, 2004. The certifications of service that accompanied the three (3) subsequently filed amended plans make no reference to service upon the City.

[5]    The City did not file a proof of claim prior to the June 1, 2004 deadline in the notice of the §341 meeting of creditors. (See Bky No. 04-10175, Doc. #10). Fed. R. Bankr. P. 3004 provides that a debtor may file a proof of claim for a creditor if a creditor does not timely file its own proof of claim. The rule states that the debtor's claim must be filed within thirty (30) days after the expiration of the creditor's filing deadline. The rule also states that the clerk shall give notice of the filing to the creditor and the trustee.

In this case, when the Debtor filed Claim No. 5-1, he filed a certification that he served a copy of the claim on the City. Although the proof of claim was filed more than thirty (30) days after the claims filing deadline, no party in interest objected to the claim. Therefore, Claim No. 5-1 was allowed.

(continued...)

Claim No. 5-1, which the Debtor certified he served upon the City, differed from his

disclosures on Amended Schedule D in two (2) important respects, stating that:

(1) the basis for the claim was a "water and sewer bill;"[5] and

(2) the debt was incurred in December 2003.

Thus, nothing on the face of the claim indicated it was intended to encompass all of the

outstanding taxes dating back to 1992 (or, in particular, the outstanding taxes from 1992-1996

that were transferred to PAID).

On February 22, 2005, this court confirmed the Debtor's Third Amended Plan ("the

Confirmed Plan").  (Id., Doc. #'s 71 & 92).  The Confirmed Plan provided for payments to the

chapter 13 trustee ("the Trustee") of $445.00 for 49 months and for full payment of all allowed

secured claims.[7]

On October 30, 2006, close to two (2) years after confirmation of the Confirmed Plan, the

City inexplicably filed a late proof of claim, Proof of Claim 7-1 ("Claim No. 7-1"), asserting a

---

[5](...continued)
<u>See</u> 11 U.S.C. §502(a).

[6]       The Debtor placed two "x's" in the box for "taxes" in the section of the proof of claim
titled "Basis for Claim," but then typed the words "water and sewer bill" next to the box titled "Other."

[7]       Paragraph 5.B. of the Confirmed Plan provided for the payment of "100% of the allowed
amount on each [Class 2] Claim.  Paragraph 4.B. defined the Class 2 Claims as follows:

> **A.  *All allowed secured claims secured by a lien which is not crandown [sic] under
> 11 U.S.C. § 1322(b)(2).***
>
> **B.  *All allowed secured claims secured by a lien which has not been claimed fully
> or partly as exempt under 11 U.S.C. § 522.***

secured claim in the amount of $47,945.25.  Claim No. 7-1 may include various pre-petition

taxes for the Ruby Street Property (other than the 1992-96 period), but the precise basis for the

claim is not clear from the face of the document and attached computer printouts.[8]  What is

certain, however, is that it was filed after the claims filing deadline, after the confirmation of the

Debtor's Plan and that the Trustee made no distribution to the City on account of the claim.  (See

id., Doc. #127).

On July 31, 2009, the Trustee filed his Final Report.  The Final Report indicates that the

Debtor made all of the payments required by the Confirmed Plan and that the Trustee made

distributions on two (2) allowed secured claims, one (1) for a total of $10,000.00 and the other

for a total of $6,800.00.  (See id.).  The $10,000.00 distribution corresponds to the allowed

amount of Claim No. 5-1 (i.e., the proof of claim filed by the Debtor on behalf of the City

relating to the Ruby Street Property).  The $6,800.00 distribution corresponds to the allowed

amount of Claim No. 4-1, also filed by the Debtor on behalf of the City, for a claim secured by a

lien on one of the other properties listed in Schedule D of the Debtor's bankruptcy schedules.[9]

Shortly after the filing of the Trustee's Final Report, on September 3, 2009, this court

---

[8]        Claim No. 7-1 appears to be for three (3) separate tax accounts for a total claim of
$47,945.25, all alleged to be secured by a "Municipal Lien."  In its Memorandum of Law, the City asserts
that the claim included real estate taxes owed the Ruby Street Property for the years 1998-2004.
However, the City offered no competent evidence interpreting the attachments to Claim No. 7-1.
Therefore, I decline to base my decision on any information included in Claim No. 7-1.  See Fed. R. Civ.
P. 56(c).

[9]        Claim No. 4-1 was a claim filed in the original amount of $18,000.00, secured by the real
property located at 681 South 58th Street.  On motion by the Debtor and by order dated August 26, 2004,
(Bky No. 04-10175, Doc. #54), the court reduced the allowed secured claim to $6,800.00.  That secured
claim was paid by the Trustee.

granted the Debtor a discharge pursuant to 11 U.S.C. §1328(a).  The case was closed on

September 8, 2009.[10]


### B.  The Sheriff's Sale Petition and the Debtor's Response thereto

Stepping back in the chronology for a moment, on November 18, 2005, approximately

nine (9) months after confirmation of the Debtor's chapter 13 plan, Wachovia filed a Petition for

a Rule to Show Cause in the Court of Common Pleas, Philadelphia County ("the CP Court"),

seeking authority to sell the Ruby Street Property free and clear of all liens ("the Sheriff Sale

Petition").  (See Ex. B attached to U.S. Bank's Mot., Civ. Action No. 2:12-cv-1600 ("D. Ct.

Case"), Doc. #9).[11]  According to the allegations in the Sheriff Sale Petition:

- the real estate taxes on Ruby Street Property were delinquent for the years 1992-1996 in the amount of $4,086.50 (including interest, fees, penalties and costs) ("the 1992-96 Taxes");

- in June 1997, the 1992-96 Taxes were included in a portfolio of delinquent real estate tax liens that the City sold to PAID;

- PAID subsequently sold the portfolio to Wachovia;

- Wachovia was empowered to recover such delinquent taxes through the tax sale process.

---

[10]   The Hon. Diane W. Sigmund presided over the chapter 13 bankruptcy case until her retirement.  On March 3, 2009, the case was reassigned to my docket pursuant to the court's random assignment procedures.  (See Bky No. 04-10175, Doc. #124).

[11]   After the case was referred to the bankruptcy court, this court attempted to replicate a docket of the pleadings by docketing the record it received from the district court, rather than having the parties re-file their respective papers.  It appears, however, that the Bankruptcy Clerk combined certain multiple district court docket entries into a single docket entry.  Therefore, for clarity's sake, when reference to the court record of this adversary proceeding is necessary, I will cite to the docket entries from the District Court case.

(Id.).

In response to the Sheriff Sale Petition, on March 3, 2006, the Debtor faxed a letter notifying Wachovia's counsel that he had filed a bankruptcy on January 6, 2004 in the Eastern District of Pennsylvania.  (U.S. Bank's Motion, Ex. D).  Thereafter, the CP Court placed the Sheriff Sale Petition in suspense for the pendency of the bankruptcy case.

On May 31, 2011, approximately twenty (20) months after the Debtor's chapter 13 discharge, Wachovia resumed its efforts in the CP Court to subject the Ruby Street Property to a tax sale.  On August 24, 2011, the Debtor filed a response to the Sheriff's Sale Petition in the CP Court.

### C.  The Federal Court Proceedings

### 1.

On May 3, 2012, almost another year after he filed his Answer to the Sheriff's Sale Petition in the CP Court, the Debtor filed a complaint ("the Complaint") in the U.S. District Court for the Eastern District of Pennsylvania against five (5) defendants: (1) the City, (2) the School District of Philadelphia ("the School District"), (3) Wachovia, (4) PAID, and ARACOR Search & Abstract Services, Inc. ("ARACOR").  (See D. Ct. Case, Doc. #8).

The key allegations in the Complaint are that:

- PAID's action of selling the tax bond to Wachovia violated the automatic stay, 11 U.S.C. §362, and also constituted an act of conversion, (see Compl. ¶3-4);

- The tax obligations that PAID sold to Wachovia were fully paid through the chapter 13 plan, (id., ¶5);

8

- Wachovia's filing the Sheriff Sale Petition back in November 2005 violated the automatic stay, (id., ¶6); and

- Wachovia's post-discharge resumption of the Sheriff Sale Petition proceedings was improper, (id., ¶¶10, 14).

The pro se Complaint is not a model of clarity,[12] but it appears to allege that PAID's action of selling the tax bond to Wachovia (postpetition, according to the Debtor) was a violation of the automatic stay, 11 U.S.C. §362(a), and amounted to conversion. The Debtor also appears to contend that Wachovia's act of filing the Sheriff Sale Petition in November 2005, as well as its act of resuming proceedings following the Debtor's discharge in May 2011 violated the automatic stay. The Complaint requests that the court prohibit the sale of the Ruby Street Property and award damages in the Debtor's favor for rental loss and "compensatory, exemplary and treble damages" as well as costs and fees associated with the case.

Based on the foregoing, I construe the Complaint to assert three (3) claims:

(1) violation of the automatic stay, pursuant to 11 U.S.C. §362 (asserted against PAID and U.S. Bank);[13]

(2) violation of the terms of the Chapter 13 Plan against the City, the School District and U.S. Bank;[14] and

---

[12]    I read the Complaint liberally in the Debtor's favor because he is proceeding pro se. See, e.g., Alston v. Parker, 363 F.3d 229, 234 (3d Cir. 2004).

[13]    The Debtor styled the Complaint as alleging a violation of the automatic stay against all defendants, but even under the most liberal reading of the Complaint, I do not perceive a claim for a stay violation as directed at either the City or the School District.

[14]    I base this on the allegation in Paragraph 5 of the Complaint that the tax claim that PAID assigned to Wachovia was "fully paid to the City of Philadelphia through [the Debtor's] chapter 13 plan."

(3) a state law cause of action for conversion against PAID.[15]

## 2.

On May 18, 2012, Defendant U.S. Bank, N.A ("U.S. Bank"), Wachovia's successor in interest,[16] filed a motion to dismiss the Complaint ("the U.S. Bank Motion"). (D. Ct. Case, Doc. # 9). A few months later, on August 29, 2012, the City of Philadelphia and the School District (collectively referred to as "the City") filed a joint motion to dismiss the Complaint ("the City's Motion"). (Id., Doc. #'s 18 & 19). The Debtor responded to both motions. (See id., Doc. #'s 16 & 20).

On November 11, 2012, the district court entered an order in which it deemed the filing of the Complaint as a request to reopen the Debtor's bankruptcy case, transferred the matter to the bankruptcy court and directed the bankruptcy court to reopen the bankruptcy case to "decide

---

[15]     The movants are entitled to summary judgment on the conversion claim. In Pennsylvania, the elements of a claim for conversion are: (1) the deprivation of or interference with another's right of property in, or use or possession of a chattel; (2) without the owner's consent; and (3) without lawful justification. See, e.g., Valley Rod & Gun Club v. Chesapeake Appalachia, LLC, 2013 WL 2392003, at *6 (M.D. Pa. June 3, 2013). There is nothing in the record that satisfies the first element of the claim.

I also note that although the Complaint makes allegations about ARACOR, (see Compl. at ¶¶7 & 11), I am unable to decipher what precisely the Debtor's legal claims are against ARACOR. In any event, the issue is not before me because ARACOR has not moved to dismiss the Complaint.

Finally, although the Complaint mentions the Debtor's discharge, I do not read it to assert that any conduct violated the Debtor's discharge rights. Such a claim would be without merit. Only actions to collect a discharged debt "as a personal liability" violate the discharge order. To the extent that the City or its lien assignee, U.S. Bank, is attempting to enforce an unpaid lien against the Ruby Street Property, that action is not an action to collect the debt as a personal liability. See, e.g., In re Cusato, 485 B.R. 824, 828 (Bankr. E.D. Pa. 2013) (citing cases).

[16]     In the balance of this Opinion, I will refer to Wachovia and U.S. Bank interchangeably.

any and all matters raised by [the Debtor] in seeking to enforce the discharge."  (Id., Doc. #27).

In compliance with the district court's order, the Debtor's bankruptcy case was reopened on December 21, 2012 and the present adversary proceeding was commenced on January 17, 2013 through the docketing of the documents transmitted to the bankruptcy court by the Clerk of the district court.  On February 28, 2013, I held a hearing on the motions to dismiss, after which I took the matter under advisement.  On July 24, 2013, while the matters were under advisement, I entered an order advising the parties that the motions would be treated as summary judgment motions (collectively, "the Motions").  Consequently, I provided the parties with an opportunity to present additional evidentiary matter pertinent to the Motions.  See Fed. R. Civ. P. 12(d). Neither party submitted additional material by the August 9, 2013 deadline.

## III. SUBJECT MATTER JURISDICTION

The Defendants seek dismissal of the Complaint pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction.  I address this issue first because, as a general rule, a federal bankruptcy court has an independent duty to satisfy itself that it has subject matter jurisdiction over any pending matter before reaching the merits of a case.  See, e.g., Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998); In re Mullarkey, 536 F.3d 215, 220–21 (3d Cir. 2008); Hubi v. Nalty, 2011 WL 2292808, at *1 (E.D. Pa. June 8, 2011); In re Olick, 2010 WL 4509828, at *1 n. 5 (Bankr. E.D. Pa. Nov. 9, 2010) (citing cases).

### A. Legal Standard

Courts evaluate a motion to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of subject

matter jurisdiction by first distinguishing whether the party makes a "facial" or "factual" attack

on the plaintiff's complaint.  U.S. ex rel. Atkinson v. PA. Shipbuilding Co., 473 F. 3d 506, 514

(3d Cir. 2007).  A "facial" attack is limited to the parties pleadings whereas a "factual" attack can

be evaluated by looking beyond the pleadings at affidavits and other evidence submitted by the

parties.  In re Reagoso, 2007 WL 1655376, at *1 (Bankr. E.D. Pa. June 6, 2007) (citing Taylor v.

Whyy, Inc., 2006 WL 2711748, at *2 (E.D. Pa. Sept. 20, 2006)); In re Cooley, 365 B.R. 464, 467

(Bankr. E.D. Pa. 2007).

       In this adversary proceeding, U.S. Bank and the City raise only a "facial" jurisdictional

attack.[17]  Therefore, in ruling upon the Motions, I will accept the allegations of the Complaint as

true and view them in the light most favorable to the Debtor, much like in a motion under

12(b)(6).  See Reagoso, 2007 WL 1655376, at *1 (citing Peregrine Surgical, Ltd. v. Synergetics,

USA, Inc., 2006 WL 3857492, at *2 (E.D. Pa. Dec. 29, 2006)).  I also will consider the exhibits

incorporated by reference into the Defendants' Motions to the extent that they are matters of

public record, for which the court may take judicial notice and the Debtor has not objected to

such consideration.  Cooley, 365 B.R. at 467.


## B.  The Tax Injunction Act

### 1.

       Both U.S. Bank and the City argue that the Tax Injunction Act, 28 U.S.C. §1341,

---

[17]       U.S. Bank claims it is making both a facial and factual attack on the Complaint.
(See U.S. Bank's Mot. at 6).  However, it presented no evidence outside the pleadings on the issue of
subject matter jurisdiction.

deprives the court of the power to exercise jurisdiction in this proceeding.  The Tax Injunction

Act provides:

> [t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.

The Tax Injunction Act has been described as "withdraw[ing] jurisdiction in a particular

class of cases." 17A C. Wright & A. Miller, Federal Practice & Procedure §4237 (West 2013)

("Wright & Miller"); accord Robinson Protective Alarm Co. v. City of Philadelphia, 581 F.2d

371, 374-75 (3d Cir. 1978).[18]  The statute  is rooted "in equity practice, in principles of

federalism, and in recognition of the imperative need of a State to administer its own fiscal

operations." Tully v. Griffin, Inc., 429 U.S. 68, 73 (1976).  Its overall purpose is "to limit

drastically federal district court jurisdiction to interfere with so important a local concern as the

collection of taxes." Rosewell v. LaSalle Nat. Bank, 450 U.S. 503, 522 (1981).[19]

Given its purpose, it is not surprising that the Tax Injunction Act regularly has been

---

[18]    I note that U.S. Bank and the City contend only that the Tax Injunction Act withdraws subject matter jurisdiction, not that subject matter jurisdiction does not otherwise exist. This is not surprising.  It is hardly a controversial proposition that a bankruptcy court has subject matter jurisdiction under 28 U.S.C. §1334(b) to determine whether a creditor has violated the automatic stay or the terms of a confirmed chapter 13 plan.  See, e.g., In re Venuto, 343 B.R. 120, 128 (Bankr. E.D. Pa. 2006) (post-discharge bankruptcy jurisdiction exists with respect to disputes "that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan" (quoting In re Resorts Intern., Inc., 372 F.3d 154, 166–67 (3d Cir. 2004))).

[19]    Even before the passage of Tax Injunction Act, "the Supreme Court [in Matthews v. Rodgers, 284 U.S. 521 (1932)] had held that federal courts would not grant equitable relief against the imposition of state taxes, even when challenged on federal constitutional grounds, as long as the state provided an adequate remedy," Robinson, 581 F.2d at 375, and that the enactment of the statute was "prompted by the readiness of some lower federal courts to assert jurisdiction over state tax challenges despite the Supreme Court's admonition in Matthews," id. (citation omitted).

invoked to terminate federal court challenges to state tax proceedings.  See Annot., What

Constitutes Plain, Speedy, and Efficient State Remedy Under the Tax Injunction Act, 31 ALR

Fed. 2d 237 (West 2013).

## 2.

In the bankruptcy context, the force of the Tax Injunction Act is blunted by those

provisions of the Bankruptcy Code that affect the holders of tax claims.  In In re Hechinger Inv.

Co. of Del., Inc., 335 F.3d 243 (3d Cir. 2003), a case involving the scope of 11 U.S.C. §1146(a)

that presaged the Supreme Court's holding in Florida Dept. of Revenue v. Picadilly Cafeterias,

Inc., 554 U.S. 33 (2008),[20] the Court of Appeals, speaking through Judge (now Justice) Alito,

rejected a Tax Injunction Act jurisdictional challenge and reached the merits of the dispute,

stating unequivocally:

> It is well established, however, that the Tax Injunction Act does not prevent a
> Bankruptcy Court from enforcing the provisions of the Bankruptcy Code that
> affect the collection of state taxes. . . .  Accordingly, the Tax Injunction Act did
> not bar the Bankruptcy Court from declaring the real estate transactions at issue
> here to be exempt from state transfer and recording taxes and requiring refunds of
> such taxes where appropriate.

335 F.3d at 247 n.1.

Presently, the case law is divided as to whether the Tax Injunction Act is trumped by

Bankruptcy Code provisions that affect creditors generally or only those Code provisions that

---

[20]     Section 1146(a) provides: "The issuance, transfer, or exchange of a security, or the
making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title,
may not be taxed under any law imposing a stamp tax or similar tax."  In Picadilly Cafeterias, the
Supreme Court held that the Bankruptcy Code stamp tax exemption, see 11 U.S.C. §1146(a), does not
apply to transfers made before a plan is confirmed under Chapter 11.

refer specifically to tax claims.[21]  Thus, the issue potentially framed by the Complaint is whether

the Tax Injunction Act precludes the bankruptcy court from exercising jurisdiction to determine

whether the collection of a tax violates the terms of a confirmed and fully performed chapter 13

plan.  See 11 U.S.C. §1327.  However, as explained below, it is unnecessary to decide this broad

issue.  On narrower grounds, I conclude that the Tax Injunction Act does not preclude this court

from exercising jurisdiction over the Debtor's claims against either U.S. Bank or the City.

### 3.

In this proceeding, the Defendants argue that this court lacks subject matter jurisdiction

over the Complaint because the relief requested would interfere with a pending state court

proceeding (i.e., the Sheriff Sale Petition) that involves the collection of a tax under state law.

As to U.S. Bank, I conclude that Tax Injunction Act issue is controlled by the reasoning

---

[21]    Compare In re Ellet, 254 F.3d 1135, 1149 (9th Cir. 2001) (bankruptcy court has jurisdiction to enjoin collection of discharged taxes, referring to the Tax Injunction Act as "incompatible with the Bankruptcy Code's detailed scheme governing the dischargeability of tax debts"); In re USA United Fleet Inc, 2013 WL 1789778 (Bankr. E.D.N.Y. Apr. 29, 2013) (Tax Injunction Act did not deprive court of jurisdiction to determine whether its order authorizing sale of assets free and clear under §363(f) precluded taxing authority from applying the debtor's unemployment compensation experience ratings to the purchaser for purposes of calculating tax premiums); In re Tougher Industries, Inc., 2013 WL 1276501 (Bankr. N.D.N.Y. Mar. 27, 2013) (same), with In re Eveleth Mines, L.L.C., 318 B.R. 682 (B.A.P. 8th Cir. 2004) (Tax Injunction Act deprived bankruptcy court of jurisdiction to determine asset sale purchaser's claim that taxing authority assessment of Taconite production taxes based, in part, on pre-sale experience of the debtor violated the bankruptcy court's order authorizing the sale free and clear under §363(f), distinguishing Ellet as a case involving a debtor, not a non-debtor); Pazzo Pazzo, Inc. v. New Jersey, 2007 WL 4166017, at *3 (D.N.J. Nov. 20, 2007) (Tax Injunction Act deprives court of jurisdiction to determine if confirmed plan provided third party discharge of tax claims against non-debtor, reading Hechinger narrowly to refer only to provisions of the Bankruptcy Code that expressly reference the collection of state taxes); In re Victory Markets Inc., 263 B.R. 9 (Bankr. N.D.N.Y. 2000) (court lacked jurisdiction to reach merits of claim that governmental authority's transfer of unemployment insurance tax experience rating to entity purchasing the debtor's assets through a confirmed chapter 11 plan violated the terms of the Plan).

of the Court of Appeals in Simon v. Cebrick, 53 F.3d 17, 22 (3d Cir. 1995).

In Simon, the private purchaser of tax certificates brought a state foreclosure action naming the Federal Deposit Insurance Corporation ("the FDIC") as one of the defendants, in an effort to divest the FDIC of the junior mortgage liens it held on the subject property.[22]  The FDIC removed the action to federal district court and filed a motion to dismiss under Rule 12(b)(6), invoking a federal statute, 12 U.S.C. §1825,[23] as a defense to the divestiture of its lien.  The district granted the FDIC's motion and dismissed the complaint.

On appeal, the Third Circuit considered two issues: (1) whether the Tax Injunction Act divested the federal courts of subject matter jurisdiction of the removed action; and (2) whether 12 U.S.C. §1825(b)(2) precluded the extinguishment of FDIC's junior mortgage liens in a state foreclosure proceeding without the FDIC's consent.[24]

The Simon plaintiff (the purchaser of the tax certificates) argued that the FDIC's invocation of 12 U.S.C. §1825(b)(2) was an act to restrain the collection of taxes and was not cognizable in federal court due to the Tax Injunction Act.  The Third Circuit disagreed,

---

[22]    The FDIC obtained the mortgages from First National Bank after the FDIC took the bank's assets in receivership.

[23]    12 U.S.C. §1825(b)(2) provides:

>    No property of the [FDIC] shall be subject to levy, attachment, garnishment, foreclosure, or sale without the consent of the [FDIC], nor shall any involuntary lien attach to the property of the [FDIC].

[24]    Surprisingly, the court determined the merits before doubling back and deciding that federal court subject matter jurisdiction existed.   On the merits, the court affirmed the district court interpretation and application of  12 U.S.C. §1825(b)(2) to protect FDIC's mortgages from being extinguished without its consent through foreclosure of the plaintiff's tax liens.

reasoning:

> [t]he [Tax Injunction Act] is intended to prevent interference with taxation by governmental entities; however, **upon the sale of the tax certificate, the tax obligation is satisfied**.  The holder's inability to foreclose does not affect the governmental entity's ability to assess, levy or collect any tax . . . .

53 F.3d at 22 (emphasis added).

Consistent with <u>Simon</u>'s rationale, the Tax Injunction Act is not implicated in this proceeding because U.S. Bank's predecessor in interest (Wachovia) purchased the City tax lien portfolio from PAID and thus, the lien obligations **owed to the City** were satisfied.  Any restraint on U.S. Bank's right to prosecute the Sheriff Sale Petition that might be imposed by the bankruptcy court in this adversary proceeding would not affect the taxing authority's (<u>i.e.</u>, the City's) ability to assess, levy or collect a tax.  Therefore, I find that the Tax Injunction Act is inapplicable.

**4.**

In concluding that the Tax Injunction Act does not apply to the Debtor's attempt to restrain U.S. Bank's collection efforts, I am mindful of those bankruptcy decisions in which tax claims assigned to non-governmental entities have been treated as "tax claims" under the Bankruptcy Code.  See <u>In re Swinton</u>, 287 B.R. 634, 637-38 (W.D. Pa. 2003) (tax claim assignee is entitled to same automatic perfection of lien for three (3) year after assessment accorded to municipality under Pennsylvania law, 53 P.S. §7147);[25] In re Jackson, 290 B.R. 527, 528-29

---

[25]        53 P.S. §7147 provides, in pertinent part:

> An assignee, upon assignment or reassignment of such tax or municipal claim
>                                                                            (continued...)

(Bankr. M.D. Pa. 2003) (following <u>Swinton</u>); <u>see also</u> <u>In re Curry</u>, 493 B.R. 447, 450-51  (Bankr.

D.N.J. 2013) (applying New Jersey law and concluding that holder of a tax claim certificate

holds a tax claim for purposes of 11 U.S.C. §511).  At first blush, one might think it appropriate

to treat assigned tax claims similarly under the Tax Injunction Act.  However, upon further

consideration, it becomes clear that such reasoning is too simplistic and would stretch the Tax

Injunction Act beyond its intended purpose.

      All of the bankruptcy court decisions that treat tax claim assignees as the holders of tax

claims under the Bankruptcy Code involved a determination of the nature of the creditor's claim

under applicable nonbankruptcy law as a prelude to determining how those pre-bankruptcy

property rights were affected by one provision or another of the Bankruptcy Code.  As such, the

outcomes were all influenced  – if not expressly, certainly "subconsciously" –  by the

fundamental bankruptcy policy that issues relating to the nature of property rights in a bankruptcy

case usually are determined by reference to applicable nonbankruptcy law, unless overridden by

specific provisions of the Bankruptcy Code.  <u>E.g.</u>, <u>Butner v. United States</u>, 440 U.S. 48, 55

(1979); <u>In re Brannon</u>, 476 F.3d 170, 176 (3d Cir. 2007).  In other words, bankruptcy policy

generally honors state law and provides for the preservation of state law rights as a starting point

before applying the provisions of the Code.

      By comparison, the Tax Injunction Act does not address the substantive state law rights

---

[25](...continued)
            not originating as a use-plaintiff claim of a nonmunicipality, shall have and
            enjoy the same rights, privileges and remedies as were held by the assigning
            municipality to enforce and collect the assigned tax or municipal claim under the
            provisions of this act or any other laws applicable to the collection and
            enforcement of tax or municipal claims.

18

of the parties in any way.  Rather, the statute is focused on the remedies provided to taxpayers

and taxing authorities under state law.  Based on our system of federalism, the Act requires that

federal courts respect the integrity of a state law taxing system and state sovereignty by

withholding federal court remedies that would interfere with state law-based tax collection.  Like

other federal doctrines mandating judicial restraint in the interest of comity, it is functional in

nature.  If the exercise of federal jurisdiction interferes with the collection of taxes for the benefit

of the governmental taxing authority  – i.e., if it would interfere with that fundamental attribute

of state sovereignty  – the Tax Injunction Act applies.  Otherwise, the Tax Injunction Act does

not apply.

This proceeding presents the latter situation because restraining U.S. Bank would not

impact the City's ability to collect taxes.  And, it does not matter that state law (53 P.S. §7147)

happens to provide U.S. Bank the right to invoke the same tax sale remedies accorded taxing

authorities.  As expressed in Simon, application of federal law to restrain the collection remedies

of the private creditor (when appropriate) does not restrain the collection of taxes by the state

governmental unit and the purposes of the Tax Injunction Act would not be served by this court

declining to exercise subject matter jurisdiction accorded to it under 28 U.S.C. §1334(b).


**5.**

As for the City's Motion, it, too, will be denied.  Whatever the precise nature of the

Debtor's claims against the City may be, nothing in the Complaint suggests that the Debtor is

attempting to restrain the City from collecting any taxes related to the Ruby Street Property.  The

Debtor appears to be seeking only monetary relief against the City.  It follows that the Tax

19

Injunction Act is not applicable.

# IV.  THE MERITS OF THE DEBTOR'S CLAIMS

Having found that this court may exercise subject matter jurisdiction over the Debtor's

claims, I now turn to the request of U.S. Bank and the City that the Debtor's claims be dismissed

on the merits.

## A.  Legal Standard

### 1.

All of the parties have requested that the court consider various documents that were not

attached to the Complaint.  On a motion to dismiss, the court may consider any undisputedly

authentic document on which the plaintiff's claims are based.  Pension Benefit Guaranty Corp. v.

White Consol. Indus. Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).  However the evidentiary matter

submitted goes beyond the documents on which the Debtor's claims are based.  This is not a case

involving consideration of a critical contract and related documents in order to assess the

viability a plaintiff's claims.  Rather, the Plaintiff's claims require consideration of a series of

documents and actions that occurred both during the Debtor's chapter 13 case and after its

conclusion.  Therefore, I conclude that I must treat the Motions as summary judgment motions.

See Fed. R. Civ. P. 12(d).  In doing so, and in evaluating the requests for dismissal made by U.S.

Bank and the City, I will look to the same evidentiary material mentioned in the prior discussion

regarding subject matter jurisdiction.  This material includes those documents that are a matter of

public record and proper for judicial notice.  See Cooley, 365 B.R. at 467 (citations omitted).[26]

## 2.

Last year, in In re Universal Marketing, Inc., 481 B.R. 318, 323-24 (Bankr. E.D. Pa.

2012) (footnote omitted), I summarized the legal standards employed in considering a motion for

summary judgment as follows:

> Summary judgment should be granted when the moving party demonstrates "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).

> Under Rule 56, the moving party is entitled to judgment as a matter of law if the court finds that the motion alleges facts which, if proven at trial, would require a directed verdict in favor of the movant. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). "[I]t is inappropriate to grant summary judgment in favor of a moving party who bears the burden of proof at trial unless a reasonable juror would be compelled to find its way on the facts needed to rule in its favor on the law." United States v. Donovan, 661 F.3d 174, 185 (3d Cir. 2011) (quoting El v. Se. Pa. Transp. Auth., 479 F.3d 232, 238 (3d Cir. 2007)). If the moving party meets its initial burden, the responding party may not rest on the pleadings, but must designate specific factual averments through the use of affidavits or other permissible evidentiary material which demonstrate a genuine issue of material fact to be resolved at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court's role is not to weigh the evidence, but to determine whether there is a disputed, material fact for resolution at trial. Anderson, 477 U.S. at 249, 106 S.Ct. 2505. A genuine issue of material fact is one in which sufficient evidence exists that would permit a reasonable fact finder to return a verdict for the non-moving party. Id. at 248, 106 S.Ct. 2505. On the other hand, if it appears that the evidence "is so one-sided that one party must prevail as a matter of law," the court should enter judgment in that party's favor. Id. at 252, 106 S.Ct. 2505. In evaluating the record, the court must view the underlying facts and make all reasonable inferences therefrom in the light most favorable to the party opposing the motion. Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995); United States v. 717 South Woodward St., 2

---

[26]    I may take judicial notice of the docket entries in this case.  See, e.g., In re G & M Enterprises, Inc., 485 B.R. 112, 121 n.20 (Bankr. E.D. Pa. 2013); In re Omega Optical, Inc., 476 B.R. 157, 159 n.2 (Bankr. E.D. Pa. 2012).

F.3d 529, 533 (3d Cir. 1993).

A party's burden of proof plays an essential role in determining the merits of a summary judgment motion. Where the movant has the burden of proof at trial, the movant must show that no reasonable jury could find for the non-moving party. Fitzpatrick, 2 F.3d at 1115. The movant "must produce enough evidence to justify a directed verdict in its favor in order to meet its initial burden." Na'l State Bank v. Fed. Reserve Bank of New York, 979 F.2d 1579, 1582 (3d Cir. 1992); see also In re Newman, 304 B.R. 188, 193 (Bankr. E.D. Pa. 2002).


### B. The Debtor's Claims for Violation of the Automatic Stay

The Debtor's Complaint alleges that the automatic stay was violated at three (3) different times.[27]  First, the Debtor claims that PAID transferred the tax claim to Wachovia post-petition without obtaining relief from the automatic stay.  Second, the Debtor asserts that Wachovia's act of filing the Sheriff Sale Petition in November 2005 during the pendency of the bankruptcy case violated the stay.  Third, the Debtor claims Wachovia violated the stay when it resumed proceedings following a discharge.


### 1.

As stated earlier, it is not clear that the transfer from PAID to Wachovia occurred post-petition.  Assuming arguendo, that it was a post-petition transfer, it did not violate the automatic stay.  "[C]ase law firmly establishes the legal principle that the post-petition transfer of a claim from a creditor to an assignee does not violate the automatic stay." Olick, 2010 WL 4509828, at

---

[27]        The Debtor also alleged that PAID's action of selling the tax bond to Wachovia was a violation of the stay.  I defer an analysis of the merits of this claim because PAID has not appeared or filed a dispositive motion.

*6 (citing authorities).

## 2.

While the Debtor did not specify which subsection of §362(a) was violated, Wachovia's act of filing the Sheriff Sale Petition against the Ruby Street Property to enforce its lien undoubtedly violated §§362(a)(1), (3) or (4).[28]  Irrespective of the particular subsection of §362(a) that might be the basis for the Debtor's claim, in order to recover damages for violation of the automatic stay, the Debtor must establish that the creditor's actions were "willful."  11 U.S.C. §362(k).  That is where the Debtor's case falls short.

"Willfulness does not require that the creditor intend to violate the automatic stay provision, rather it requires [only] that the acts which violate the stay be intentional."  In re Lansdale Family Restaurants, Inc., 977 F.2d 826, 829 (3d Cir. 1992) (citing In re University Medical Center, 973 F.2d 1065 (3d Cir. 1992)).  However, to prove a willful violation of the automatic stay, a plaintiff also must show that the creditor had knowledge that the automatic stay was in place.  Id.  In other words, while a debtor need not show that a creditor had the specific intent of violating the automatic stay, the debtor must show the creditor took deliberate action after having knowledge of the automatic stay, that had the effect of violating the automatic stay.  See In re Nixon, 419 B.R. 281, 288 (Bankr. E.D. Pa. 2009).  For these purposes, knowledge of the existence of the bankruptcy case is considered knowledge of the automatic stay.  See In re B.

---

[28]      Section 362(a)(1) prohibits any action to recover a pre-petition claim.  Section 362(a)(3) stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  Section 362(a)(4) stays "any act to create, perfect, or enforce any lien against property of the estate."

Cohen & Sons, Inc., 1991 WL 17834, at *3 (E.D. Pa. Feb. 13, 1991); In re Wagner, 74 B.R. 898, 905 (Bankr. E.D. Pa. 1987).

In the Complaint, the Debtor does not allege, and there is nothing in the record to suggest that, Wachovia had any knowledge of the Debtor's bankruptcy filing when it filed the Sheriff Sale Petition in November 2005. Wachovia was neither listed in the Debtor's bankruptcy schedule nor provided for in the creditor mailing matrix. Therefore, while the filing the Sheriff's Sale Petition appears to have violated the automatic stay, the Debtor has neither alleged facts nor generated any evidence that could satisfy the "willfulness" element of a claim for damages for violation the automatic stay under 11 U.S.C. §362(k). Accordingly, the claim will be dismissed.

**3.**

The Debtor's third claim for violation of the automatic stay fares no better.

Under 11 U.S.C. §362(c)(1), a stay of an act against property of the estate terminates when the property is no longer property of the estate. Further, 11 U.S.C. §362(c)(2) provides that the stay against other acts under subsection (a) expire at the earlier of the time that (1) the case is closed, (2) the case is dismissed or (3) the debtor receives a discharge. See 11 U.S.C. §362(c)(2).

According to the Debtor, Wachovia resumed the Sheriff Sale Petition proceedings by removing the case from deferred status and taking legal action to sell the property on May 31, 2011. This was nearly two (2) years after the Debtor received his discharge (September 3, 2009) and the case was closed (September 8, 2009). The automatic stay had long expired by the time Wachovia resumed the Sheriff Sale Petition in May 2011. Therefore, the Debtor's claim that Wachovia's action violated the stay is without merit.

24

### C.  The Debtor's Claim for Violation of the Chapter 13 Plan

### 1.

I have interpreted the Complaint as alleging that the Defendants' actions violated the terms of his Chapter 13 Plan because the 1992-1996 tax claim (that the City transferred to PAID and PAID transferred to U.S. Bank's predecessor, Wachovia), had been fully paid through his Confirmed Plan.  (Compl. at ¶5).

The Debtor's argument, in its best light, is that he provided for the City's claim in the Confirmed Plan, he paid the allowed claim, and the transfer of the City's claim secured by the Ruby Street Property without notice to him during the case should not affect the binding nature of the plan on the City (and its assignee, U.S. Bank).  Thus, the Debtor's theory is that the Property revested in him free and clear of all claims and interests, and that after the completion of his plan and the conclusion of his case, neither the Debtor nor the Property is obligated to repay any pre-petition municipal liens that may have actually existed but were not paid through the Confirmed Plan.  See generally In re Bryant, 323 B.R. 635 (Bankr. E.D. Pa. 2005) (creditor who filed erroneously an understated claim was bound by terms of confirmed chapter 13 plan that treated that amount as full payment of the claim).

### 2.

A secured creditor's continued attempt to collect a debt that was fully paid through a confirmed chapter 13 trustee may run afoul of both 11 U.S.C. §1327(a) and §1327(c).

Section 1327(a) of the Bankruptcy Code provides:

> The provisions of a confirmed plan bind the debtor and each creditor, **whether or not the claim of such creditor is provided for by the plan**, and whether or not such creditor has objected to, has accepted, or has rejected the plan.

(emphasis added).

Section 1327(c) of the Bankruptcy Code provides:

> Except as otherwise provided in the plan or in the order confirming the plan, the property vesting in the debtor under subsection (b) of this section is free and clear of any claim or interest of any creditor **provided for by the plan**.

(emphasis added).[29]

Section 1327 may be enforced though invocation of the bankruptcy court's authority under 11 U.S.C. §105(a) to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the plan."  See In re Padilla, 389 B.R. 409, 428-433 (Bankr. E.D. Pa. 2008).[30]

---

[29]    The term "provided for by the plan" is a term of art that also is employed in 11 U.S.C. §1325(a), the Code provision setting forth the requirements for confirmation of a chapter 13 plan. Section 1325(a)(5) states that if a plan "provides for" a secured claim, the plan must, inter alia, provide for full payment of the present value of the underlying debt and the holder's retention of its lien during the pendency of the plan.  See 11 U.S.C. §1325(a)(5).  This is not intended to be a comprehensive, precise statement, as there are nuances to these confirmation requirements that I am not discussing here because they are not relevant to the present issues.

[30]    In Padilla, I held that a chapter 13 debtor may invoke the equitable power of the bankruptcy court under 11 U.S.C. §105(a) to enforce the debtor's rights under 11 U.S.C. §1327(a) because such orders are necessary and appropriate to enforce the provisions of the Bankruptcy Code and do not override any other applicable Code provisions:

> The need for a confirmed plan to be enforceable is intrinsic to the chapter 13 rehabilitation process. Otherwise, the confirmed plan would be a scrap of paper (or perhaps more accurately in today's digital age, a collection of electronic impulses) that creditors could disregard with impunity. Given the role of the confirmed plan in the chapter 13 system, the principle that a confirmed chapter 13 plan must be enforceable requires no extended or elaborate justification. It is difficult to conceive how the chapter 13 system could function if confirmed chapter 13 plans were not judicially enforceable.

(continued...)

**3.**

The merits of the Debtor's claim turns on two (2) material, undisputed facts.

First, no party  – neither the Debtor nor the City –  filed a proof of claim for the 1992-96 tax claim secured by the Ruby Street Property.  On its face, Claim No. 5-1 referred to water and sewer claims.  Nothing on the face of Claim No. 5-1 suggested that it was intended to be a comprehensive proof of claim for payment of all pre-petition municipal claims associated with the Ruby Street Property.[31]  Nor did any provision of the Confirmed Plan purport to suggest that Claim No. 5-1 was to be treated as a comprehensive claim encompassing all of the City's pre-petition municipal liens against Ruby Street Property.

Second, the Confirmed Plan provided only for **allowed secured claims**.  Because no party filed a claim for the 1992-96 Taxes, which the Ruby Street Property secured, and therefore, no claim for those taxes was allowed, the Confirmed Plan did not provide for the debt; the 1992-96 Taxes fell outside the defined class of creditors provided for in the Confirmed Plan.

Based on these facts, I conclude that any claim for relief based on §§1327(a) or (c) is without merit.

It is true that §1327(a) does not require that a claim be "provided for" in a plan for the plan to bind a creditor.  However, the legal principle that a plan is binding on a creditor

---

[30](...continued)
389 B.R. at 429.

[31]    The City eventually filed Claim No. 7-1, see n.7, supra, that might have included the 1992-96 Ruby Street Property taxes.  Claim No. 7-1 was filed late, well after the claims bar date and the confirmation of the Debtor's chapter 13 plan.  Accordingly, it effectively was treated by the Debtor and the Trustee as a nullity.  I see no reason to treat it otherwise now.

necessarily contemplates that plan include some provision that addresses, affects or restricts the

creditor's rights in some fashion.[32]   For example, had the Confirmed Plan included a provision to

the effect that payment of any allowed claims for municipal liens on the Debtor's real property

shall be made in full satisfaction of all pre-petition municipal liens on the property, §1327(a)

arguably would have required that the City accept the plan distribution from the Trustee in full

satisfaction of its claims.   In this case, however, the Confirmed Plan did nothing of the sort.   It

stated only that allowed secured claims would be paid; it was silent with respect to secured

claims that were not allowed.

Because the plan did not address the secured claim for the 1992-96 Taxes on the Ruby

Street Property in any way, the controlling legal principle is that if a lien is not addressed and

treated in some fashion during the course of a bankruptcy case  – either by being provided for in

a reorganization plan or avoided pursuant to a Code avoidance power  – it passes through the

bankruptcy case unaffected and that post-bankruptcy actions to enforce the lien do not violate any

provision of the Bankruptcy Code.  See, e.g., Cusato, 485 B.R. at 828 (Bankr. E.D. Pa. 2013)

(citing authorities, including Lellock v. Prudential Ins. Co. of America,, 811 F.2d 186, 189 (3d

Cir. 1987)).

Any claim for relief under §1327(c) fails for all the same reasons.   Furthermore, §1327(c)

requires that a claim be "provided for" by a plan and, as discussed above, the Confirmed Plan did

---

[32]     A plan might also provide that a creditor's rights are not being altered or impaired in any
way.  In some sense, that is "providing for" a claim.  But, such a plan provision would leave the
creditor's lien in place.   See also Cusato, 485 B.R. at 833 (property rarely revests free and clear of all
liens pursuant to §1327(c) following confirmation in chapter 13 cases because plans typically provide
otherwise in order to comply with the §1325(a) confirmation requirement that secured creditors retain
their liens during the pendency of the plan).

not "provide for" the secured claim for the 1992-96 Taxes.

## 4.

Any claim under 11 U.S.C. §1327 must fail for an additional, independent reason – the City (and by extension, U.S. Bank) cannot be bound by the Confirmed Plan due to lack of notice.

The rules of court require that a copy of the plan or a summary of the plan be served on all creditors along with the notice of the confirmation hearing. See Fed. R. Bankr. P. 3015(d). In this district, an extremely concise summary of the plan is included with the notice of the §341 meeting of creditors. Furthermore, the local rules supplement this requirement by providing that the debtor must serve a copy of his or her initial chapter 13 plan and all pre-confirmation amended plans on all priority and secured creditors. See L.B.R 3015-1(b) and 3015-2(a)(1). As stated earlier, the record reflects that the Debtor did not serve the City with any of his proposed chapter 13 plans prior to confirmation of the Confirmed Plan.

It is well established that a prerequisite to the binding effect of a confirmed chapter 13 plan to the legal detriment of a creditor is dependent upon the creditor having received proper notice. See, e.g., Keith M. Lundin & William H. Brown, Chapter 13 Bankruptcy §233.1, ¶9 (4th ed. 2013) (www.Ch13online.com) (citing authorities for the proposition that "the binding, vesting and free and clear effects of confirmation" have been limited when "notice of how the plan or confirmation process would affect creditors fell short of the notice required by the Rules or due process"). The "appropriate inquiry" is whether the creditor received notice reasonably calculated to apprise the creditor of the pendency of the plan and the opportunity to object to its confirmation. See In re Borkowski, 446 B.R. 220, 224 (Bankr. W.D. Pa. 2011); see also In re

29

Mansaray-Ruffin, 530 F.3d 230, 238-39 (3d Cir. 2008) (court will not enforce a chapter 13

confirmation order if doing so would result in a denial of due process);[33] In re Linkous, 990 F.2d

160, 162 (4th Cir. 1993); Bryant, 323 B.R. at 639-40; In re Ramey, 301 B.R. 534, 545 (Bankr.

E.D. Ark. 2003) (citing cases).

　　　　Based on these authorities, I conclude that the Confirmed Plan is not enforceable against

the City for lack of notice.

　　　　As for U.S. Bank, successor in interest to Wachovia, it too had no notice of the chapter 13

proceeding in general or the Confirmed Plan in particular.  At best, as the recipient of an

assignment of the City's claim, U.S. Bank might be said to have stepped into the City's shoes.

Having failed to give notice of the assignment to the Debtor, U.S. Bank arguably should be

bound by the Confirmed Plan to the same extent as its assignor, the City.  However, the claim

also fails against U.S. Bank because I already determined that the City is not bound by the

Confirmed Plan.


# V. CONCLUSION

　　　　For the reasons set forth above, judgment will be entered in favor of the City, the School

District and U.S. Bank and against the Debtor and further proceedings will be conducted to

determine if the Complaint should be dismissed as to PAID and ARACOR.

---

[33]　　　Mansaray-Ruffin may have been overruled in part by the Supreme Court's decision in
United Student Aid Funds, Inc. v. Espinosa, 559 U.S. 260 (2010), at least insofar as Mansaray-Ruffin
suggested that the failure to employ the adversary proceeding procedures, when applicable, constitute a
per se due process violation.  See Borkowski, 446 B.R. at 224 n.7.  However, the more fundamental
principle articulated in Mansaray-Ruffin  –  that a confirmation order entered without due process is
unenforceable – was not questioned in Espinosa and remains good law.

An appropriate order will be entered.

**Date: <u>August 15, 2013</u>**

_____
**ERIC L. FRANK**
**CHIEF U.S. BANKRUPTCY JUDGE**